The next case is 24-5268, Kogap v. City of Medford. Good morning, Your Honors. Good morning. And may it please the Court, Brian Hodges for Appellant Kogap Enterprises. I'd like to reserve three minutes for rebuttal. Just keep your eye on the clock. Thank you. This case asks whether the City of Medford can lawfully require Kogap to dedicate rights of way across their property and pay to build a new public road and part of a bridge without providing evidence showing that its demand bears an essential nexus and is roughly proportional to any impacts attributable to the proposed revision. Why doesn't it bear an essential nexus? That is the most complicated question in this case. We don't know precisely what the city is claiming the nexus to be. It has altered between increased traffic originating in new development to the east and south. But I think we're past that, right? Now aren't we down to traffic congestion? Yeah, traffic congestion. That seems to be the most common rationale. Well, it's because they didn't conduct a traffic study. The only traffic study on record is Kelly Sandow's study, which concluded that swapping the uses, the fast food with the strip-style retail, actually would significantly reduce the amount of vehicle traffic along Garfield Street. I thought that study showed that it would increase over time. No, it didn't. There was a fight about how much it would increase. But I thought it was clear that the proposed development along there, not various changes, but the proposed development, would increase traffic along that street. It makes perfect sense, doesn't it? If there's no development there now and the street is there, there's going to be some increased traffic to serve the development once the development goes in, right? I think you're misunderstanding. The development was already permitted there. I understand. The strip-style retail. It's just a comparison between what is projected now versus what was projected under the previous approved plan in 2017. And so I think I understand Judge Hurwitz's point the same way. And I appreciate that there isn't a net projected increase in traffic between the previously approved plan, 2017, and now. But there is a net projection that it will be more concentrated, right? More congestion. No, there is no expert study stating that it would be more congested. That is a conclusion that Public Works included in their staff report. What's wrong with that conclusion? Of course, well, there are two things that are wrong with their conclusion. First, the conclusion was based on a mistake, that at the time that the Public Works recommended this condition, they misread or they read an earlier Sandow memo that had projected 634 new vehicle trips. That was fully mitigated in the 2017 PUD. That was corrected later. The city then admitted on the record and the city council found that there would be no increase in traffic. Yet they— When you say traffic, do you mean trips or congestion? Trips, trips. Okay. I think we got past the no additional trips. I agree. Yeah. The conclusion that no increase in traffic would result in congestion is the type of conclusion that needs to be reached through an expert report. That's what the traffic impact analysis process is for. The city code requires, if it believes that there's going to be a significant traffic impact, the city code requires a traffic study addressing congestion. So is your position with respect to the—this is the first part of the Dolan test. Yes. Step one. Your position is that they weren't—they couldn't ask for anything. No, that is not my—my position is that Nolan and Dolan placed the burden as well as Oregon State. No, I understand. So on this record, could they ask for anything? Could they ask for anything on this record? No, because they did not— That is your position. Okay. Yes, because they did not identify any impacts attributable to the proposed revision. And because of that, when you move to the proportionality analysis, there's no quantification. They do say that this road is necessary to alleviate future traffic, off-site traffic. There's no apportioning of that traffic. The comparison model is just outright prohibited by Nolan. In Nolan, if you recall, at pages 840 to 841, the Supreme Court rejected the very same argument from the California Coastal Commission that had said, we have made the same demand for beachfront easement from other property owners as some sort of argument to legalize the demand that was being made against Mr. Nolan. The Supreme Court said that the fact that you demand similar easements or similar dedications from other property owners has no bearing on nexus. But that's a step one. Yes. Okay. And I thought you'd move to step two, and at least I'd like to. Okay. Yes. Yes, they are. But let me explain it. They're joined. Because if you don't have a nexus— We understand. We never get to step two if you don't have a nexus. Okay. So as to step two, and I must admit the case law is not particularly helpful on it, how do I conduct a rough proportionality analysis? In other words, what if the city had said, we want you to do something that costs $10,000, $1,000. I don't know what this project costs, by the way, and that's a separate issue. And we found that there was a nexus. How would we figure out whether that number was roughly proportional?  Courts have dealt with that. I cite the BAM case out of Utah, FP development. Certainly it's comparing apples to oranges when you're talking about vehicle trips and then, on this other hand, new pavement. But there are ways that they do that. They look at the whole system. They do a traffic impact analysis, look at the traffic system, and often they look at the cost of, say, we're just talking about Myers Lane. They look at the cost of improving Myers Lane, look at all of the sources, so look at the existing residences that would benefit and also look at the new development to the west and south of COGAP. And then it's rather easy to apportion. I thought you thought we weren't supposed to look to the projected development west of COGAP. Not when determining the dedication on COGAP itself. But in doing the proportionality analysis, they're supposed to quantify their findings, which would include apportioning when you have— I appreciate that, but I'm still looking for an answer to Judge Hurwitz's question before I ask mine. How should we do it? Well, you don't have to do it. The city has to do it. The city has a burden of— I appreciate that. How do we review it? How should it have been done? First of all, doing a traffic impact analysis on their own. Every case has to have a traffic impact analysis. Well, that's what they do. I mean, that's what they do when they come up with— You've asserted that repeatedly in your briefing. I'm just trying to figure out what your strongest support is, that they really have to have that. And since they don't have that, that they necessarily lose. Well, I'd say the strongest support is look at the BAM development case out of Utah. The Utah Supreme Court went into great detail as to how a local government can apportion a percentage of traffic infrastructure increases. And I just say this because it's done every day through things like traffic impact fees, where the government looks at the projected impacts and then apportions the responsibility. I appreciate that, but is there any— Is that what you want me to look to support the proposition that the city of Bedford really had to do this type of study in order to meet its burden? Well, they have a burden of demonstrating that— Look at Dolan itself. In Dolan, they did do a traffic study. There's lots of cases where they've done one. I'm just trying to figure out where does it say that they have to do one. And if it hasn't really said that, that's not necessarily—this is not a smoking gun. It's not a trick question. I just can't find anything that tells me that they have to. Well, what they have to do— Has any court said that? Oh, excuse me. I'm sorry. That's okay. Has any court said that? Not that they have to do a traffic study. Courts have approved that methodology. Right. FP Development searches the case law to find this evidence of a reliable and industry standard methodology can establish proportionality. Ultimately, I think the question you're asking, though— I asked my question, and I think you answered it, and I'm taking up too much of your time on this. So can I go on to the next point, please? Yes. I want to ask a specific question, please, about ER 104 and 105. This is the Mays and Associates report, and it says that the drive-through restaurant development is happening north of Garfield. Isn't it all south of Garfield? I'm sorry. What was it?  ER 104, 105. I don't know if I'm looking at a typo or if I misunderstand. This says that the drive-through restaurant development is happening north of Garfield. North of Garfield. That is a different portion. That's not the portion that we are talking about. We're only looking at south. We're only looking at the south. Okay, I appreciate that. Yeah, and the north, by the way, was mitigated by a right-in, right-out turn lane, which the city said not only— that's where the Chick-fil-A is. The city said not only will that mitigate, but that will improve the traffic flow on Garfield going the other direction. Why do we have such a gap in the record about what this is going to cost, what the city's exaction is projected to cost? We provided evidence that the value of the property itself would be around $500,000, that the— Property for the road extension? Yeah, for the roadway extension. That would go over the right-of-way. Yep. And that the bridge would be roughly $150,000, and then the improvements would be another $150,000 or $200,000, depending on the— it could be even more, depending on the size of road they ultimately require. The city's estimate is significantly lower, and I couldn't tell whether the city's estimate includes the cost of having to relocate and dedicate other land for a parking lot. No, the city's estimate—it also discounted the cost of construction, because the city used— I know about the cost of construction, but could—forgive me, but could you answer the first question? If you use the right-of-way to extend the road, you're going to have to use other land for the parking lot. So my question—the first question was, did the city include the cost of the additional land that will have to be dedicated to the parking lot?  No. Okay, and then you were trying to answer another point. Well, I just wanted to bring up that on the previous—their previous attempt to impose this exaction, I know that the city now claims it to cost around $150,000 with all of their discounts built in, but on ER 250, the previous—when they tried to exact this roadway dedication before, they estimated the cost to be $700,000.  So— Did the district court make any findings about that? No, no. So let's assume we had to get to Phase 2. Yeah. Shouldn't we send it back to figure out what this project actually costs? I mean, if it costs $10, you wouldn't be here, I hope. Obviously, yeah. And if it costs $10 million, they'd have a very difficult time defending it. And one of my problems is, on this record, I just don't know what it's going to cost. The record, unfortunately, is closed. That we have these statements—I think that the one figure that we have agreement on— I understand the record is closed, but the judge made no findings. Yes, the judge made no findings. Let me ask a version of this question. You said $500,000. That amount is how much the land that would be used by the road would cost? That's the fair market value of the land? That's what you're saying? Yes, that was the fair market value of the land as zoned. The fair market value of the land that would be occupied by the road? Yes. Or the easement? Yes. That's a lot of money for a little, tiny easement. Excuse me? That's a lot of money for a little, tiny easement. It is. It's valuable property. And— Oh, forgive me. Were you done with your answer? I am done. Thanks. Do you want to reserve your time? You're down to two minutes. Oh, yes. Thank you. I'll reserve my time. Okay. We'll hear from the City's Council, please. Thank you, Your Honors. May it please the Court, Hannah Harding on behalf of the City of Medford. There's a lot of questions that I would like to answer and weigh in on, but I think I want to start with what we see as the crux of the issue here. Case law has told us over and over again there's no mathematical formula. And what COGAP wants the courts to decide is that zero new trips equals zero impact on traffic. And that is a fundamental disagreement of the City. I think we're past that. I think that there's a—right? I tried to put that aside, and I think Council agreed. There's an indication there'll be more congestion, and the City has a legitimate concern about the congestion. We appreciate that. And we appreciate that this is a typo about the development north of Garfield. I think we know where it's located. But why—how do we—how would we even— even if I give you step one, right, that there's legitimate concern there, how do we do a proportionality analysis without knowing what this is going to cost? Well, that is a complicated question to answer. The rough proportionality, like case law said, is we compare certain kinds of things to other kinds of things. We really don't have super clear guidance on how to do a rough proportionality analysis. Nor do we have a record that demonstrates what those things are. I mean, that's sort of my problem. I mean, the District Court didn't say, well, I am comparing apples to oranges, but here are the apples and here are the oranges. It just didn't say anything about it, did it? I don't know that I fully understand that question. Well, so let's assume—tell me how one would conduct a rough proportionality analysis and tell me how this record would allow us to determine whether that analysis was good, bad, or indifferent. Yes. So, counsel was correct that the two are tied. You can't really go on to rough proportionality until you do the essential nexus and determine that there is a connection between the condition imposed and the impacts of the property. And then we go on and we say, okay, we take those impacts and we compare them to what the exaction will do. I think it's appropriate to compare what the benefits to the property are. I think it's appropriate to compare what we've—in this case, we're saying traffic congestion. And I do want to point out that I don't believe it's a typo about North O'Garfield Street. Where the exaction is, is South O'Garfield Street. We have concerns about congestion South O'Garfield Street. But in the application, the 2022 PUD revision, the zone swap, which the zone is not at issue. The zoning was granted. What it did is it allowed COGAP to put a Chick-fil-A at the corner of where Garfield Street goes. Oh, that's the drive-thru restaurant development, different drive-thru. Correct. Correct. So now we have a Chick-fil-A, a Panera, we got Jamba Juice, we have Annie's. And whether you're going to Chick-fil-A going north or you're going into south, you're taking Garfield Street. Help me understand when you say congestion. Where is the congestion going to take place? Is it going to take place on Garfield? Is it going to take place south of Garfield? Where are we talking about that congestion that you're trying to alleviate? The city's anticipating that the congestion will take place on Garfield Street. And so how will that be alleviated by a bridge that will take the traffic, if the traffic wants to go there, on Myers Lane? Because as I look at the maps that I've seen, Myers Lane is a tiny little thing that goes through some residential areas, comes across the bridge, and then comes back up to Garfield. If I'm understanding this correctly, the only way I'm ever going to do that instead of just stay on Garfield is if the traffic on Garfield is absolutely stopped. Is there something that tells me that that's going to happen, that the traffic on Garfield is going to be that bad because of this development, and therefore this will be a feasible alternative route? Well, Your Honor, Myers Lane is planned to be extended to run completely parallel to Garfield Lane. So right now it does, you're correct. It's a tiny development that then goes back up to Garfield. But the plan, and these are approved plans, they're not speculation, is to extend Myers Lane, and there's additional residential developments that are going to be developed. And who's going to do that extension on Myers Lane? Well, those aren't built yet. Who owns that property at the moment? COGAP does, Your Honor. So all that land, so here's... Well, at least some of the developments. I don't know that they own all of it. There's a lot of residential developments going on, but I know the main one along Garfield is also owned by COGAP. So here's the end, comes down to the little bridge, and then it goes along, rolls that way, and it continues along that way. That property is owned by COGAP? Correct, Your Honor. And do they anticipate developing that? How do we know? It has actually already been approved for development of these residential lots. It's been adopted into the city of Medford's comprehensive plan to develop all of those neighboring properties to the south and west of the Stewart Meadows development into residential properties. And have you done any study that tells us what the traffic is likely to be once that's happened? I'm not aware of that, Your Honor. Because I'm trying to figure out what studies we have in front of us now that talk about the traffic impact of what's currently being proposed. I mean, my problem is we don't have a lot of studies, and at least as we have the existing patterns here, I'm not convinced that there's going to be a lot of traffic over that little bridge. And, Your Honor, there might not be. The city of Medford's point wasn't that Myers Lane Connection was going to solve all of the problems. It is that... Well, is it going to solve any problem? Well, it has the potential to take some of the burden off of Garfield Street for those that are coming from those residential developments. But the residential developments that haven't taken place yet. Correct, but they are planned. So if we figure out, if we get to this roughly proportional part of the analysis, why is the bridge, why is the requirement of the bridge roughly proportional to the current problem? I understand the improvement of the road, et cetera, but I don't understand why, if we're looking at the current time, the bridge is a roughly proportional solution. Well, it's the only connection that can be made in that area within the urban growth boundary. There's no other place that we can put another local street connection to take burden off of. I know, but given the amount of traffic that's, or congestion, that you expect, which is, you know, we might be able to quantify. We know the number of cars and trips. Do you really need a bridge to deal with those few trips? The city's position is that yes. Of course it is. But I'm asking why. This is where I get concerned about the cost of the bridge, where we don't really have a traffic study. The city's position is based on what exactly? Well, I think you made a point earlier that there's no case law that says we have to do a traffic study. But we have to figure out that there's a proportionality. I understand. I realize that. I'm sorry. Yeah, that's okay. We're trying to do our job here, and this is a tough one because we don't know what this is going to cost. Correct. And we're not really sure why it's necessary. Well, the reason we don't know why it's going to cost is because the city gave COGAP options. They don't have to do it as a public road. It can be an interior access road. It can be a private road. In the city's point of view, the parking lot that was there, you don't have to have, like, a road going straight from Anton to Myers Lane. You can have an entry to the parking lot, you can drive around the parking lot, and you just need a connection there. So I think the reason there's such a discrepancy on how much this is going to cost is because when we imposed this condition, we were hoping that COGAP would come back and tell us, this is how we'll build it, this will be the cost, but instead they appealed. So we don't actually know the plans for how that will be built. It seems to be a theme today of people not talking to each other and coming to court instead and just making that observation. And I don't mean to be flip, but it's a tough record for us. So what is your best shot? My best shot, in terms of how is it roughly proportional, is that when we do consider the costs, if we agree $700,000 is how much this is going to cost, the impacts that are potential, when we're talking about drive-thru restaurants, people usually are using these kind of two set times during the day, lunchtime and dinner. So if we have three or four concentrated to an area that weren't there before, before the traffic was going to go around the whole development, now where it's more concentrated to this one area, and at peak times, lunch and dinner, there could be congestion on Garfield Street every single day. So in a way to alleviate that is connecting this other portion so that we have a local street to take some of the pressure off of Garfield Street. When you're talking about congestion in an area every single day, and the cost to alleviate that is $700,000, I think that's a proportional request. Now do you have any study that, I'm coming back to my own sort of practical thing, I'm picturing myself as wanting to go to dinner, to have a dinner at Chick-fil-A, and I'm going to stay on Garfield Street unless it's really blocked. I mean, if it's just kind of slow, I'm going to stay on Garfield Street. The only way I'm going to dip down and go through that tiny little Rose Lane and then across that bridge and then back up is that it's really awful on Garfield Lane. Do you have a study that's going to tell me that Garfield Lane is going to get that backed up at dinnertime? I don't have a study for that, Your Honor, no. No, a lot of this was practical considerations. We have traffic engineers on staff that looked at Sandow's traffic study. There was no need for us to do our own. We generally agreed with their math. We just disagreed with the premise that zero new trips compared to the prior applications. Because you're correct, this is green space before this. There was nothing there. And prior to 2017, that area south of Garfield wasn't even part of the PUD. And so there are new trips being created with the development. It's just how those trips are going to be concentrated and where they're going to go in and out. But the 2017 plan was approved. Correct. And this is not an increased number of trips over the 2017 plan. Correct. And the 2017 plan didn't require this exaction to extend Myers Lane and build a bridge, right? It didn't. It required the building of Anton Drive. Right. And in that situation, the city gives COGAP the parameters, this is the way to build it, but they're not overviewing all the construction for it. And at that time, we didn't know what was going to go into the area around there. They since changed that with a revision. I only have one more question, but my colleagues might have more. The new, I forget, Chick-fil-A, because I think Chick-fil-A is already there, right? It's been built, yes. Okay, so whatever it is that Judge Fletcher is going to eat dinner at, this new one, is that going to be built along Anton Drive? Or where are the restaurants planned to go in? So the restaurants that I'm aware of have actually all been built. Oh, they have? Yes. But there is still more development to happen along Anton Drive, and there's that little space between Anton Drive and Myers Lane neighborhood. Yep, I'm looking at it. There's a few lots there. Okay, your briefing talks about additional development. It's not fast food restaurants that haven't already been built? It's not the drive bins? So in the briefing, we're talking about additional development because at the time of the application, they hadn't been built, but because this was an approval with conditions, they were allowed to build, but then they appealed the conditions. So when we started this, Chick-fil-A wasn't there. Panera SPAC was anticipated, the architecture. I understand why the briefing overlapped. Now the chronology is plain. Thank you. I do have a question. Go right ahead. Surprisingly. I'm trying to figure out the procedural history here. They made an application to the city. The application was we would like you to approve a development plan, right? Yes. And you said fine with this condition, at least for purposes of this litigation. If we were to find that the condition were illegal under the Dolan tests, what status quo are we returning to? Could you then turn to their application? No, the application has been granted. I thought it was granted subject to this condition. It was, but my understanding of the case law and the procedures is that COGAP is suing for damages. So they want compensation. I think they have to build it no matter what. That's my understanding. I'm not sure. Okay. That's helpful. I'll ask your friend this, too. Because it seemed to me that otherwise, if they were just trying to strike the condition, you would still have the ability to say later, okay, we approve it, but here's a different condition that might meet. Only if they did another PUD revision and we went through the ‑‑ I couldn't figure out why a developer would be fighting if it delayed their development. Now I understand. Okay, good. Any other questions? Good. Thank you. Did you want to have any closing remarks? Other than I do believe that the district court got this one correctly, and I understand that the record is confusing. It is long. This has been going on for a very long time. And ultimately the city's goal here is to just make construction or encourage construction that makes sense. And it's good for all the citizens of this city. Thank you for your advocacy. Thank you, Your Honor. Okay, a couple of quick points, just clarifying some of the facts. One, and the question whether who owned the future development properties is beyond this record, but COCAP only owns some of the property. There are other developers that own property. Are you talking now about property to the west? Yes, property to the south and west of the PUD. Thank you. The statement that there's no other place for the Myers Lane connection is not true. Myers Lane currently connects about 800 feet west of Anton Drive, and they could use that to develop the Myers Lane bypass as well. Here's a legal question for you, and I think you and I are likely to disagree. I think your position is we don't get to consider, as it were, cumulative impacts of various proposals. We have to consider them in isolation one by one when we're dealing with these questions. Actually, surprisingly, we agree. Nolan, I believe it's footnote four, stated that you can look at cumulative impacts, but the analysis later, you still have to be able to apportion. You still need to show that the proposed development will contribute to those, and then when it comes to proportionality, you have to apportion responsibility. I see. And can we do this in terms of anticipated development? Yes. So it's not legally forbidden to the city to look at the development that would take place if the Rose Lane continues, if Myers Lane continues out through the property that's currently undeveloped? No, and state case law says the same thing, that they can consider it, but with the caveat that you still need to show that the Stewart Meadows contributes, has impacts that contribute to that problem, and also then you have to apportion it according to all of the other sources of traffic impact. I see. But your point would still remain we need a study to look at that, and we don't have that study. Exactly. I'm out of time with that. With that, we ask that you reverse the district courts. Thank you. Thank you. We'll take that matter under advisement and go on to the last case on the calendar. Thank you both.
judges: FLETCHER, CHRISTEN, HURWITZ